THE AMERICAN INSURANCE COMPANY *v.* OGDEN and
MACOMB, 20 Wend. 287–322.

In S. Ct. 15 id. 535.

*Sea Worthiness ; Abandonment for Total Technical Loss ;
Deduction of One-Third New for Old.*

THIS was an action on a policy of insurance originally
brought by Ogden and Macomb, in the New York Superior
Court, against the defendants, as underwriters on three-fourths
of a schooner, in the names of Ogden and Macomb, as the *agents
of the owner*, loss payable to them. The policy was for six
months from the 17th of November, 1829 ; sum insured,
$1,800. The vessel sailed on the 26th of November, on a
voyage from New York to Charleston, thence to Norfolk,
and thence to St. Thomas in the West Indies. While
going into Charleston harbor, and while the vessel was in
charge of a pilot, the *small bower anchor* was lost on the
outward bar. The schooner did not go up to the city ; but
discharged her cargo, which consisted of stone, about a mile
and a half from the city. The vessel remained five or six
days in the harbor ; the pilot engaged to get up the anchor
but did not ; and the wind being fair, the schooner sailed for
Norfolk, where she arrived in safety. On her arrival there,
the master made inquiries for an anchor, but could not pro-
cure one of a suitable size ; those he saw, were too heavy or
too light. He remained there nine or ten days, took in a
cargo of shingles, and sailed for St. Thomas, on the 7th of
January. Three days afterward, the schooner sprung a
leak in consequence of a heavy cross sea, and in three days
more she encountered a heavy gale, with a heavy sea ; her
sails were split, and her mainmast sprung, and she became
very leaky. She, however, succeeded in reaching St. Thom-
as, on the 25th of January. The master, after making in-
quiries of mechanics, made an estimate that the vessel could
not be repaired and rendered sea worthy for less than $1,700.
The cargo was discharged, and a survey was taken of the
vessel by three surveyors, appointed by the U. S. consul,
who reported that the repairs might be made for $800 or
$900. The master was wholly destitute of funds ; the con-

signees of the cargo refused to make advances, the *freight* having been previously drawn for, and they holding a protested draft for the same; and money could not be obtained on *bottomry*, although the master attempted to raise money in that way for the purpose of making repairs. Under these circumstances, the vessel was sold at auction and brought only the sum of $388. The plaintiffs abandoned as for a total loss. The insurance company offered to pay the loss, as estimated by the surveyors at St. Thomas; which offer the plaintiffs refused, and brought their suit.

On the trial in the New York Superior Court, the defendants requested the judge to charge the jury, 1. That St. Thomas being the *port of destination*, the inability of the master to procure there, the necessary funds for repairing the vessel, was not a sufficient ground of abandonment. 2. That the policy being *on time*, the warranty of seaworthiness attached as a condition precedent at the commencement of each voyage, during the period which it covered, and that it being admitted that the vessel was unseaworthy, from the want of an anchor, when she left Charleston, and also when she left Norfolk, the defendants were discharged from all subsequent perils; or, if the judge was of a different opinion, that then he should charge that the evidence was not sufficient to excuse the *laches* of the master, in not recovering the anchor, or obtaining a new one at Charleston, and that therefore the defendants were discharged from all subsequent liability; and 3. That if the judge should be of opinion the *laches* of the master at Charleston was sufficiently excused, then that he should charge the jury that it was the duty of the master after his arrival at Norfolk, if an anchor could not be there obtained, to procure one from a neighboring port; and if the jury should be of opinion that by sending to Baltimore or New York, or any other neighboring port, the master could have obtained one without unreasonable delay of the voyage, then that the defendants were entitled to their verdict. The judge charged the jury that the inability of the master to procure the necessary funds at St. Thomas was a valid cause of abandonment; and further instructed them that the vessel continued to be covered by the policy during the

voyage, and that the plaintffs were entitled to recover, if the negligence and laches imputed to the master were sufficiently excused, and that the material question of fact on that point was, whether the master made use of due diligence at Norfolk to obtain an anchor. The defendants excepted to the charge. Verdict for the plaintiffs for $2,161; on which judgment having been rendered, the defendants brought error to the Supreme Court.

A majority of that court, Savage, Ch. J., and Nelson, J., (Bronson, J., dissenting,) held, Savage, Ch. J., delivering the opinion :

1. "That the seaworthiness, implied in a policy of insurance, related only to the commencement of the risk; if then broken, the insurer was discharged; but that a breach of this warranty after the risk has begun, does not discharge the insuree, *unless the loss be the consequence of such unseaworthiness.*"

2. "That it is not necessary that the injury to a vessel by the perils insured against, should, *in all cases*, exceed *one-half the value* to justify an abandonment as for a total loss; the inability of the master to procure the necessary funds to make repairs, is a valid cause of abandonment, although the vessel be in the *port of destination*, and not an intermediate one, or one of necessity."

After disposing of the question of seaworthiness, as above stated, Ch. Savage says: "The next point urged in behalf of the insurers is, that the want of funds wherewith to make repairs is not a good ground of abandonment." "The right is as perfect, under the construction which has long been given to policies of insurance, to recover for a *technical total loss*, as for an *actual* total loss, or a partial loss. In the case of *Peele* v. *The Merchant's Ins. Co.*, 3 Mason 65, Mr. Justice Story after a very elaborate review of most, if not all the cases on this point, comes to the conclusion that the right of abandonment exists, in the five cases, which he enumerates, the fifth and last of which is "Where the injury is so extensive, that by reason of it the ship is useless, and yet the necessary repairs would exceed her present value." He further remarks : "If there be any general principle that pervades and governs them, it seems to be this; that the

34

right to abandon exists, whenever, from the circumstances of the case, the ship, for all the useful purposes of a ship for the voyage, is, for the present, gone from the control of the owner, and the time when she will be restored to him in a state to resume the voyage, is uncertain, or unreasonably distant, or the risk and expense are disproportioned to the expected benefit and objects of the voyage. In such a case, the law deems the ship, though having a physical existence, as ceasing to exist for purposes of utility, and therefore subjects her to be treated as lost." The conclusion here drawn from the case, has received the approbation of Chancellor Kent. In his commentaries, 3 Kent, 322, he says : "The conclusion is, that the right of abandonment is to be judged of by all the circumstances of each particular case, and that there is *no general rule ;* that the injury to the ship by the perils insured against, must, in all cases, exceed the one-half her value, to justify an abandonment." The case of the *Patapsco Ins. Co.* v. *Southgate and others,* 5 Peters R., 604, exemplifies this principle. The opinion of the court was delivered by Thompson, J. He states that the court below had instructed the jury that if the vessel could not have been repaired without an expenditure *exceeding half her value at the port of Carthagena, after such repairs,* it constituted a total loss. "This direction," says the learned judge (Thompson,) " we certainly think correct."

Ch. J. Savage continues :

"In the case under consideration, the defendants below raised no question of fact for the jury upon the *bona fides* or *discretion* of the master." "This presents the point whether the *inability to repair the vessel,* which must be admitted to have been a real inability, was a good cause of abandonment. These facts conceded, it seems to me to come precisely within the case of *The Patapsco Ins. Co.* v. *Southgate,* where a sale of the ship had become necessary for the interest of all concerned."

" In this case, the master had all the means of acquiring credit which the control of the ship gave him, which in this action I think is sufficient."

Bronson, J., dissented, on the ground that the want of funds in the port of *destination,* was not of *itself,* a suffi-

cient ground of abandonment, and under the circumstances, was the fault of the assured.

From this decision the defendants brought error.

In the Court of Errors, Walworth, Chancellor, and Verplanck and Wager, Senators, delivered opinions in which they fully concur with the decision of the Supreme Court on the point of *seaworthiness*. The Chancellor thus concludes his remarks on that part of the case: "And in the recent case of *Hollingsworth* v. *Broderick*, 1 London Jurist, p. 430, in an action upon a *time* policy by the assured against the underwriter, the defendant pleaded in bar to the action, that subsequently to the policy and before the loss, the ship became broken, damaged, and unseaworthy; and that by care and diligence, and with little expense, she could have been rendered seaworthy; but that the assured neglected to make such repairs, by reason whereof she remained unseaworthy until the time of the loss. Upon demurrer to this plea, Lord Denman and the other judges of the court of Queen's Bench held, that " the plea formed no defence to the action, as it was not averred that the vessel was lost *in consequence of such unseaworthiness;* and that the implied warranty only applies to the commencement of the risk." I am satisfied, therefore, in the present case, that the assured were entitled to recover for the subsequent damages to the vessel, although she had been previously rendered unseaworthy by the loss of the small bower anchor, and continued so up to the time of the disaster, upon her passage from Norfolk to St. Thomas. It only remains to consider whether the underwriters were liable for a *total*, or only for a *partial loss*."

On that point he thus proceeds: " The insurance by this company was upon three-fourths of the vessel only, and valued at $1800; the whole vessel was therefore valued at $2400. And if this is, for the purposes of the policy, to be taken as her real value in ascertaining whether she could have been repaired for less than one half her value, deducting one-third new for old, then there is no pretence that the assured had a right to abandon on that account, as the very highest estimate of repairing at St. Thomas was but $1700. That sum after deducting one-third new for old, would leave the cost of repairs but $1133,33, or less than half the value as stipulated in the policy." (See note ☞ at the end of this

case as to this calculation and the obligation of the owners or assured as to repairs in a port of destination.)

As to the deduction of one-third new for old, he says: "I am aware that in the case of *Peele* v. *The Merchant's Ins. Co.*, 3 Mason's Rep. 27, Judge Story, whose opinion is entitled to great weight upon a question of insurance, held, that, the value of the vessel, as agreed upon by the parties and inserted in the policy, was not to be taken as the *true value*, in determining whether the repairs would exceed half her value, in reference to the question of abandonment. He also decided in that case, that in determining the same question, the deduction of one-third new for old, from the estimated repairs, was not to be made."

From these two opinions of Judge Story, notwithstanding "the great weight his opinion is entitled to," the Chancellor avows himself a dissentient. He says: "In the *first* insurance cause* which came before me as a circuit judge, I followed his decision as to the first point, but not as to the last; although I had, at the time, some doubts as to the correctness of his decision upon both points. It now appears that the Supreme Court of Massachusetts has expressly overruled his decision in that case, not only as to the deduction of one-third new for old, so as to settle that question in conformity with the reported decisions of the courts in this state, but also as to the conclusiveness of the valuation in the policy; in which decision of the state court I most fully concur. Upon this last question, it appears to be impossible to add to the strong and conclusive reasoning of Putnam, J., in the case of *Debtors* v. *The Ocean Ins. Co.*, 16 Pick. 312." (After giving a page of this reasoning,) the Chancellor adds: "To what has been so well said on this subject by another, I will merely add, that by adhering to the valuation in the policy, much litigation will be prevented, which is generally a serious injury to the assured."

The Chancellor, p. 300, further says in regard to the rule of allowing the assured to abandon when the vessel has been

---

* *American Insurance Co.* v. *Center*, 4 Wend. 45, where the Chancellor relates the same thing and sets up the same opinions; though that case turned on different questions.

damaged to more than half her value : " The rule of permitting the assured to abandon when the vessel has been injured to more than half the value, does not exist in England. It was first adopted in this country from a similar rule in relation to an insurance upon the cargo, in some of the other maratime countries of Europe ; and among others in France, according to Pothier ; and it is now adopted as a part of the maritime law of France, in terms, by the more recent commercial code of Napoleon ; except that the new code requires that the loss should be at least three-quarters of the value of the property assured, to authorize an abandonment on that account. Code du Commerce, art. 369. He says : " The courts of this country should be careful how they depart from the established rule, or they will find the underwriters and the assured again involved in the ruinous litigation which the adoption of a fixed and certain rule was intended to obviate."

As to the impossibility of repairing the vessel at St. Thomas, the Chancellor says : " In the case now under consideration, however, there was no impossibility of repairing the vessel, on the ground that she was in a place where there was no money to borrow, or workmen or material to be procured on credit, to make the repairs. Here the vessel was in *one* of the regular ports of *destination,* with her cargo on board when she arrived in a disabled state ; the impossibility, if any, of procuring funds or credit to make the repairs, arose from the fact that the master, either by his own fault or the improvidence of his owners, was not only deprived of the benefit of his and their personal credit, but was divested of all the other means, except the vessel itself, which the law places under his control, for the repair and preservation of the ship. I therefore concur with Mr. Justice Bronson, in the opinion expressed by him in the Supreme Court, that this was not a proper case for converting what was, in fact, only a partial loss, into a total loss." " The principle of submitting it to a jury in each case, to decide what a prudent owner would do, for the purpose of determining the right of the assured to abandon, would necessarily lead to ruinous litigation and would deprive both the insurers and the assured of all the benefits of the rule as to the extent of

repairs exceeding half the value of the vessel." "I think, therefore, that the judgment is erroneous and should be *reversed ;* and a *venire de novo* awarded to enable the assured to recover his actual damages as for the partial loss only."

With this opinion of the Chancellor, Senators Verplanck and Wager concurred in holding, as did the Supreme Court, that the underwriters were not discharged by the *unseaworthiness,* as the loss was not actually occasioned by the want of the anchor. They also concur with him as to the liability of the underwriters for a *partial loss* only, but as to the deduction of *one-third,* they say nothing. On the question being put, *" Shall this judgment be reversed ?"* all the members of the court with one exception voted in the affirmative, and the judgment of the Supreme Court was *reversed* accordingly.

☞ The manner in which the Chancellor has stated the *second* question in this case, might lead one to suppose without an examination of it, *in extenso,* as reported in other courts, that the question of deducting one-third new for old had *necessarily* arisen, or, at least, had been discussed in some shape by the counsel or the court below. No trace, however, is found in the report of the case, either in 15 Wend., or in 20 Wend. in the Court of Errors, that such a point was made in the Superior Court, on the trial of the cause, or on the argument in the Supreme Court, or even on the argument in the Court of Errors. Yet the Chancellor thus states the question, in his opinion : "2. Whether the master was justified in selling the vessel, for the want of funds to repair, in her third port of discharge after the commencement of the risk; *although the actual cost* of repairs at that port, *deducting one-third new for old,* would, if the master had been *furnished with funds, or had possessed the ordinary means of obtaining them, have been less than half the value of the vessel, as fixed by the parties in the policy.*"

Now, if there were no other objection to the decision of the Court of Errors in this case than the mode in which the question of *one-third new for old,* is thus, in the Chancellor's statement of the second question, smuggled into the cause, that alone ought to strip it of a large share of the re-

spect which we in general entertain for the decisions of the Court of Errors, and those of the Chancellor himself. But we can not, and we ought not to remain silent where we see a most material point, which had not been raised in either of the courts below, first started by the highest law member of the Court of Errors; argued by him *solus;* decided by him alone; no counsel heard upon it; no deliberation of the other members of the court upon it; and no intimation by either of the other two members who delivered opinions, that such a question was or could be legitimately presented for decision. Under such circumstances, with all our respect for the ingenuity, ability, and we might add, adroitness, displayed in the Chancellor's opinion, yet, as to his opinion on *that* point, the very *manner* of its introduction should deprive it of all *authority* as a precedent in our commercial jurisprudence. If the Chancellor deemed this question of the deduction of one-third fairly presented to the court by the facts in the case, why did he not move for a *re-argument* of the cause, as to that particular point? This, it must be admitted, is the ordinary course in courts of superior jurisdiction, where a question deemed material to the decision of a cause has been overlooked, or but slightly argued by counsel, the court comes to consider it as a material, or perhaps, the turning point in the cause. To do otherwise, seems to be not only an injustice to the counsel, but a positive wrong to the party against whom the decision may be made. It is to decide his cause unheard; it is to hear a *part* of a cause and to decide the whole upon the part remaining unheard. Nor is this the only objection to such a mode of proceeding. It exposes the judge who pursues it to the temptation, to some minds almost irresistible, of showing himself, if not "*sapientior sapientissimis,*" at least, *astutior astutissimis.* It is an open announcement by the judge that the counsel, notwithstanding their study, research, and intimate acquaintance with the facts of the case, have mistaken the real, the true point in it, while he, the judge, has the sole right of discovery. The practice on such occasions, of ordering a re-argument, seems not only to be demanded by judicial gravity and deliberation, but by a strict sense of justice to the suitors. In this case the assured had not only a right to

be heard upon the question of one-third new for old, if it were deemed an open one upon the facts; they had also a right to object to its being raised for the *first time* in the Court of Errors, as the objection might probably have been obviated by evidence, or the judge's charge, in the court below. Even granting that the rule of deducting one-third new for old in such cases of *total technical loss*, in order to ascertain the party's *right to abandon*, were ever so well settled, the assured had a right to show, at all events, that it was not applicable to a case where repairs were *impossible*. He had a further right to contend that the question of such impossibility, notwithstanding the imputed negligence of the assured in regard to providing funds for the purpose of repairs, was a question for the *jury*, and for the *jury alone* to determine. Of these questions, in their order.

But first, let us see what new force the case of *Smith* v. *Bell* had acquired on this subject, by any subsequent decisions in our own courts, or by such recognitions as could be considered a judicial acquiescence in its authority. As to express decisions upon the point, there had been none down to this case of the *Am. Ins. Co.* v. *Ogden;* at least, none are reported. And in regard to judicial recognitions of it as a precedent, we have not been able to find a single *dictum*, of any judge but Chancellor Walworth himself, in support of its doctrine. The first occasion which he seized in the Court of Errors to promulgate this doctrine, was in 1829, in the case of *Dickey* v. *The Am. Ins. Co.*, 3 Wend. 658. In that case, the Supreme Court had decided in 1825, that "as the master had *repaired the vessel*, and she was in the actual prosecution of her voyage, at the time of abandonment, although that fact was not then known to either party, the right to abandon was gone, and the assured was entitled only to recover *for a partial loss.*" This decision was in conformity to that in the case of *Church* v. *Bedient*, and in *Peyton* v. *Hallett*, 1 C. C. E. 21. *Ante* p. 246. No question was made as to the loss having been a total technical one, and entitling the assured to abandon, if the repairs had not been made. Yet the repairs are stated to have been "upwards of $14,000 only, not $15,000, which according to the Chancellor's calculation in this case, would have been necessary to

make it a total technical loss. He himself admits this case of *Dickey* v. *Am. Ins. Co.*, to have been a total technical loss. He says, p. 662: "There is no doubt in this case that a technical total loss had occurred, and that the assured abandoned immediately on hearing of the disaster." But he has prefixed to this admission the following *præmium*; "It is a well settled rule of American insurance law, that if a vessel is damaged by any of the perils insured against, so that the necessary repairs to restore her to her former state, and render her seaworthy, will exceed *three-fourths* of her value before the disaster, the owner is not bound to repair, but may abandon as for a total loss. The injury is usually spoken of as an injury to more than *half her value*, because in estimating the repairs, one-third is deducted on the ground that the vessel is made more valuable by substituting new materials for old." Now, did this case call for any such expression of opinion, as to this mode of *calculating repairs*, so as to determine the right to abandon? And if it did, would not the result be the very opposite of that at which the Chancellor arrives? But either way, this earliest expression of the Chancellor on the subject, is but an *obiter dictum*, that adds no weight to the decision of his predecessor, Chancellor Lansing, in the case of *Smith* v. *Bell*. We come next to the case of *Center* v. *The Am. Ins. Co.* decided in 1829.

In the case of *The American Ins. Co.* v. *Center*, 4 Wend. 45, the Chancellor also has discussed this and another question, and given us the full benefit of his peculiar doctrines as to both. He there says: p. 49, 50—51.

"This is an action upon a policy on the *freight* of the ship Pallas, on a voyage from New Orleans to Havre; and the right of the plaintiff to recover for a total loss depends upon the question, whether there was a valid abandonment to the underwriters upon the policy on the *ship*. I shall, therefore, proceed, in the first place, to examine that question."

"From whatever source the principle was derived, it is now well settled in this country that the assured may abandon for a total loss whenever the ship is injured by the perils insured against, to a *moiety* of her value. But there has been some diversity of opinion as to the mode of applying

35

the principle to particular cases.   On the trial of the suit on the ship policy it was insisted, on the part of the underwriters, that in determining the question of total technical loss, the assured was bound by the valuation in the policy; and that he had no right to abandon, unless the expenses of repairs, after making the usual deduction, would exceed a moiety of the value as thus fixed.   Having *at that time*, a very imperfect knowledge of insurance law, I* decided that question against the underwriter on the authority of *Peele* v. *The Merchants' Ins. Co.*, 3 Mason's Rep. 27, which case had then been published only in pamphlet form.   As the counsel for the assured were not willing to risk their cause upon Judge Story's opinion on that point, they waived the benefit of my decision in their favor, before the cause went to the jury.   Although this question was afterwards argued in the Supreme Court, it does not properly arise upon the bill of exceptions in this case ; and I merely notice it here for the purpose of saying that the doubts I entertained as to the correctness of my decision on this question at the trial, have not been weakened by subsequent investigation and reflection.   *The extent of the injury is to be calculated with reference to the value of the ship before the disaster.   Hence the application of the principle of deducting one-third from the estimated expense of full repairs*, for the purpose of ascertaining whether she is injured to a moiety of her value."

"For the purposes of this suit, the value of the ship at the time of the disaster is fixed at $10,000 as estimated in the policy.   It is also found by the jury that the expense of full repairs of the ship at New Orleans, including copper at its usual price at that place, would have exceeded a moiety of that sum after making the usual deduction of one-third. But full repairs could not have been made at that port, because *no suitable copper was to be had*."   "The counsel for the assured suppose this was a sufficient cause of abandonment, although the ship was not injured to a moiety of her

---

* This cause was tried at the New York Circuit in April, 1826, before the Chancellor, he being then one of the circuit judges of the state.   *Reporter's note.*

value. I know of no principle which can authorize the abandonment of a vessel, either in port or elsewhere, because materials cannot be had there to make full repairs. If the ship is not injured to a moiety of her value, *it is the duty of the master to make her seaworthy*, and to proceed on her voyage; and if the assured completes the repairs afterwards, the underwriters must pay the additional expense, so as to furnish a complete indemnity."

The Chancellor, it must be observed, himself admits that " from the facts found by the jury, there was a total loss of the ship, viewing the case in the most favorable light for the underwriters." Per Walworth, Chancellor, 4 Wend. p. 52. The deduction of one-third new for old having been made, the case is still within the category of total technical loss. Where, then, was the necessity or propriety of this passing *protestando* against the authority of the case of *Peele* v. *The Merchants Ins. Co.*, decided by Mr. Justice Story? The benefit of the Chancellor's decision in favor of the assured on this point, had been waived at the trial before the cause went to the jury. p. 50. The question, therefore, of deducting one-third new for old to determine the right of abandonment could not possibly arise in the case. This *iteration* of the doctrine seems also to call in question the weight and effect given by the jury to the survey and report of the port-wardens, ship-masters, and ship-carpenter at New Orleans, and leads us to infer that if the loss had not, after deducting one-third new for old, exceeded half the value of the vessel as fixed by the policy, the Chancellor would have disregarded the survey and estimates at New Orleans, and have insisted upon applying his and his predecessor's Procrustean rule to this very case of *The Am. Ins. Co.* v. *Center*, although as the report states, (p. 46, 4 Wend.) " A survey was held by the port-wardens, assisted by three ship masters and a ship-carpenter—associated with the wardens at the request of the agent of the insurance companies of New York resident at New Orleans,"—" and the wardens and the others concurred in the opinion that the expense of repair would amount to nearly the full value of the ship; and that it would be more to the interest of all concerned to abandon and have her sold for whatever she might bring, than to put

upon her the expenses necessary to place her in a seaworthy condition." And such is the tendency of the remarks he makes in page 51, as to the *duty* of the master, if *he* had decided to repair." As if *he*, the *master*, was justifiable in disregarding the result arrived at by this commission of surveyors on the spot; nay more, under an obligation to reject it and to govern himself by the rule insisted on by the chancellor, as the certain and invariable criterion of the right of abandonment. "If the master had decided to repair in this case, what would have been his natural course? As he could not re-copper her at New Orleans, the ship would have been rendered sea worthy for the voyage by wooden sheathing of a proper thickness to receive the copper afterwards; and there being no copper fastening at New Orleans, iron fastenings must of necessity have been used." What master would take such a responsibility after calling a survey? Why, if the ship thus tinkered, had been wrecked or foundered on the voyage, is the Chancellor so very a fresh water sailor as not to know that the master could never expect to get another vessel during the remainder of his life. And when the Chancellor says," "I know of no principle which can authorize the abandonment of a vessel, either in port or elsewhere, merely because materials cannot be had there to make full repairs,"—does he, could he mean to say that the question of making repairs or not in such a case, is not to be decided by *evidence* of the state of the vessel, by the opinions of experts, and other pertinent matters to be *submitted to a jury*? Or, does he really mean to say that, in such a case, if the actual damage is not, after deducting one-third new for old, more than half the value estimated in the policy, that then there is *no room* for the question of abandonment? It is admitted that no such rule exists or ever did exist in England. The courts of that country have paid more heed to the rights of juries in such cases. They have not sought to withdraw these questions from their true natural arbiters. That *general principle* is far more important than either of the questions on which the Chancellor thinks it so indispensable to have an uniform rule.

But it should also be mentioned that in this very case, the Chancellor's opinion, although as extra-judicial as could well

be, did not pass without a *dissentient* voice from one of his colleagues in the Court of Errors. Senator Allen, who delivered the only other opinion, took occasion to express his opposition to the doctrine of the Chancellor's opinion, on this point of deducting one-third new for old, although he concurred in the *unanimous* opinion of the court, that the judgment of the Supreme Court should be affirmed.

Senator Allen says, p. 55. " The value of the policy is, *in general*, a good criterion by which to judge of the value of the ship ; and the expense of repairs at the port where she has taken shelter, is the rule by which to determine the amount of injury received, and the estimate must be such as will fully reinstate the vessel with the same or equally as good materials, as she was composed of at the time of the disaster. On the subject of repairs, *one-third new for old*, there appears to have been opposing opinions. The case of *Dupuy* v. *United Ins. Co.*, (3 J. Cas. 182,) on one side, and *Dunham* v. *Com. Ins. Co.*, (11 J. R. 315,) on the other. But in my view, the deduction of one-third new for old will hardly apply to cases of abandonment for a total loss ; the assured in such case receives none of the benefits intended by the rule."

(Senator Allen cites the case from 11 J. R. 315, as though it were a case in which a deduction of one-third new for old, had been sanctioned by the Supreme Court, in a case of *total technical loss.* But the case was one of *partial loss and actual repair*, and there was no claim of total loss, nor was there any abandonment. The only question there decided as to the deduction of one-third, was, that it was to be made whether the vessel was *new* and on her *first* voyage, or was not. He probably meant the case of *Smith* v. *Bell.*)

But it is time to hear Judge Story, in support of the doctrines, which he laid down in *Peele* v. *Merchants' Ins. Co.* which the Chancellor is thus anxious to put under outlawry. In *Peele* v. *Mer. Ins. Co.*, 3 Mason's R. 70, after saying that it is a fixed rule, that the assured may abandon when the vessel is injured to more than half her value, Mr. Justice Story says :

" But here we are met with *two* difficulties on points of law, which it is singular, considering the antiquity of the

rule, should not have been long since definitely adjudged, as it is impossible, that they should not often have arisen. The first difficulty is, as to the mode of ascertaining the value of the ship. The second is, as to the mode of ascertaining the *quantum of expense or injury*. Is it to be the actual cost of the repairs, or the actual cost deducting one-third new for old ?"

"Upon the first point, it is contended by the defendant's counsel that the valuation in the policy is conclusive, and affords the only just means of ascertaining the value, it being as between the parties, the *agreed* value of the ship. The plaintiffs deny this doctrine, and insist upon the actual value of the ship, at the time of the loss, as the true value."

"Nothing is more familiar or more clearly settled, than the doctrine, that the valuation in the policy is conclusive in case of a total loss; but it is inapplicable for the purpose of ascertaining the *quantum of injury,* (for it is quite another question as to the *quantum of payment* to be made by the underwriters,) in case of a partial loss of goods. When the policy is on goods, the invariable rule is to ascertain the qnantum of injury by the difference between the price of the sound and damaged goods; and the reasons of the rule have been expounded with so much force and accuracy, that it would be a waste of time to repeat them."

The learned judge then says, that " The real object of the valuation is to decide if the ship be worth repair. The law deems her worth repair unless injured more than half her value. *At what time?* Surely at the time of the injury, and not at the commencement of the voyage; for to *that period only*, can the *worthiness of repair* apply. The value at the commencement of the voyage, might be a third greater or less than at the time of stranding; and thus the right of abandonment would be made to depend not upon the proportion of *present value* (to the repairs) but upon the value at à former period. The ship might be damaged three-fourths of her present value, and yet an abandonment would not be good; and on the other hand, she might be damaged only one-third of her present value, and yet it would be good. *It does not strike me that such a state of things is*

consistent with the true meaning of the rule as to the half value.

"Then as to the bearing of the authorities on this subject; I have looked into all the cases, and I can not find an instance, in which the doctrine as to the half value of the ship, is referred to any other period of the voyage, than that of the happening of the calamity, or the subsequent arrival in port. In short, to the very time when the question arises, of *reparable or not*? The very point arose in *Fontaine* v. *The Phenix Ins. Co.*, 11 J. R. 293, and the learned Chief Justice, Kent, ruled at the trial, that the value at the port where the injury happened, and not the valuation in the policy, was to be taken in applying the doctrine of abandonment. A new trial was ultimately granted upon another point; but the inclination of the court manifestly upon this point was, that the ruling of the Chief Justice was right. In the absence of all contradictory authority, the decision of his luminous and accurate mind would go very far to satisfy mine, even if I entertained, which I certainly do not, any doubt on the subject. The foreign writers also, who have treated the subject, appear to me to have proceeded upon the tacit assumption and recognition of the same doctrine in all their reasonings."

"Then as to the other point, whether the actual cost of the repairs to the owners, on the cost, deducting one-third new for old, is the rule by which we are to ascertain the *quantum* of injury or loss? That is a point upon which a great deal may be said on both sides. The propriety of the allowance of one-third new for old, in cases where the ship is not abandoned, or in other words, in cases of a partial loss, is not contested. The rule itself is somewhat arbitrary, and not founded upon any exact calculation, with reference to the particular case. The ship may be almost or entirely new, and then the reason for the deduction would altogether cease. The ship may be very old, and then the reason for a much greater allowance would apply." "Still the rule is arbitrary, and therefore is to be confined to the cases, where the usage is clear, or to cases which necessarily fall within their analogies. Does it then enter as an ingredient into the rule of abandonment, where there is a loss of half the value.

" In examining the authorities, it is beyond all doubt, that no case in England has ever recognized any such deduction of the one-third, except in cases of a partial loss.   In all the cases where the injury to half the value has been in question, not the slightest allusion is made to any such deduction by court or counsel.   Yet some of these cases would seem to have called for some expression in its favor, if it existed. In *Dà Costa* v. *Newnham*, 2 T. R. 407, the deduction was held not to apply, except when the owner received back his ship, upon the plain ground that the owner ought not to pay where he received no benefit.

" The question however has arisen in *America*.   In *Dupuy* v. *The United Ins. Co.*, 3 J. C. 182, the point was directly in judgment, and indeed formed the turning point of the cause.   And it was there held by the *unanimous* opinion of the Supreme Court, that the deduction was not to be made; and that it was the actual damage of expenditure which was contemplated by the rule, without any reference to the distinction of new for old.   That decision was subsequently acted upon by the court, and though it was finally overturned by the Court of Errors, it is impossible not to feel, with all due reverence for the latter tribunal, that upon questions of this nature, the learning, experience, and distinguished talents of the Supreme Court of New York, entitle their judgment to very great consideration.   I have examined the reasons given by the Court of Errors for the reversal, 2 C. C. E. 153, and I am compelled to say that they do not convince my judgment.   *Ego assentior Scævolæ.*   The case of *Coolidge* v. *The Gloucester Ins. Co.*, 15 Mass. R. 341, appears to me to have contemplated it in the same light; and I take occasion to add, that if in that case, the deduction of one third new for old had been made, and the valuation in the policy had been taken, there would not have remained an *expense* of one half the value of the ship to justify an abandonment.   My judgment upon the whole is, that the deduction of the one-third can not be legally made in cases of this nature !" '

Now, upon the first point discussed by Judge Story, viz., in regard to the rule of valuation, as to repairs, whether we are to take the estimated value in the policy as the criterion,

*in all cases,* or that of the *actual* value of the ship after the disaster, we do not intend to be drawn into the debate. The authorities on the one side are the *decisions* of Judge Story in this case, and in the case of *Robinson* v. *The Commonwealth Ins. Co.,* 3 Sumner's R. 220; the cases of *Patapsco Ins. Co.,* 5 Pet. R. 604; and *Bradlie* v. *Md. Ins. Co.,* 12 Pet. 378. On the other side, these *dicta* of Chancellor Walworth, and his opinion in *Am. Ins. Co.* v. *Ogden,* and the case of *De Blois* v. *The Ocean Ins. Co.,* 16 Pick. 312. It may suffice to give as to this point of value in the policy, the following from Chancellor Kent's Commentaries, which sufficiently indicates his opinion.

Chancellor Kent, in the 5th edition of his Commentaries, 3 Kent's Com. 330–331, in discussing the rule, " *one half of the value,*" says:

" The meaning of the words in the rule, ' one-half of the value,' has been held to be, the half of the general market value of the vessel at the time of the disaster, and not her value for any particular voyage or purpose." And he cites the case of *Bradlie* v. *The Maryland Ins. Co.,* 12 Pet. 378, assenting to the rule there laid down, that "if the ship is not or would not be worth, at the place of repairs, *double the cost of repairs,* it is a total technical loss." He proceeds. " In ascertaining the value of the ship, and the quantum of expense or injury, difficulties have arisen, and they were fully discussed and very clearly explained in *Peele* v. *Mer. Ins. Co.* The valuation in the policy is conclusive in case of a total loss ; but in some respects, it is inapplicable for the purpose of ascertaining the quantum of injury in case of a partial loss of goods. The value of the ship at the time and place of the accident, is the true basis of calculation.* And with respect to the arbitrary and fluctuating rule as to the allowance of one-third new for old, there is no doubt of its application in cases of partial loss ; but such a deduction is not allowed, and does not apply to cases of total loss."

* Note of Chancellor Kent to this passage, 3 Kent's Com. 330.

" *Patapsco Ins. Co.* v. *Southgate,* 5 Pet. U. S. Rep. 604.

" The valuation in the policy, at the home port, or in the general market of other ports, constitutes no ingredient in

ascertaining whether the injury by the disaster is more than one half of the vessel or not. *Bradlie* v. *Md. Ins. Co.,* 12 Pet. 378. This decision pronounced by Mr. Justice Story, was in conformity with the doctrine declared by him in the case of *Peele* v. *The Mer. Ins. Co.,* 3 Mason, 27, but a different rule has been adopted in Massachusetts and New York, in avowed contradiction to the decisions in the federal courts. It is held in the courts in those states, that the value of the vessel, as agreed upon by the parties and inserted in the policy, is to be taken as the true value in determining whether the repairs would exceed half her value in reference to the question of abandonment ; and that it governs as well when the assured claims for a total *technical loss,* as when he claims for a loss by a total destruction of the ship ; and further, that in determining the *same question,* the deduction of one-third new for old, was to be made from the estimated amount of the repairs." He cites as to Mass., *De Blois* v. *The Ocean Ins. Co.,* 16 Pick. R. 312. N. Y.: *Am. Ins. Co.* v *Ogden,* 20 Wend. 287, 297–300.

Those pages, ' 297–300,' embrace Chancellor Walworth's opinion on those points which Chancellor Kent seems to have considered as decided by the court. But, as we hope to have shown already, they were mere *obiter dicta* in that case, and not entitled to any weight as an adjudication.

Now in the case of *De Blois* v. *The Ocean Ins. Co.,* so much relied on by Chancellor Walworth,—Putnam, J., who delivered the opinion in his turn, relies entirely and solely, for supporting the rule of deducting one-third in cases of *total technical loss,* upon the case of *Smith* v. *Bell,* as his authority. He cites no other, and he could not at that time, cite any other from our New York reports, in support of it. He declines to notice the opposing case of *The Patapsco Ins. Co.* v. *Southgate,* which was decided in the Supreme Court of the United States, at the January term, 1831, although he was delivering his opinion on the same points ruled in that case, at the October term, 1834, when he surely must have read that decision. But he does not even recognize its existence !

Our learned Chancellor, also, in the case of the *Am. Ins. Co.* v. *Ogden,* seems to have been afflicted with the same obstruction of judicial vision. The case of *Peele* v. *The Mer. Ins. Co.,* decided in 1822, is the latest and only case

referred to as sustaining the doctrines he was assailing; but the case of *The Patapsco Ins. Co.* v. *Southgate*, 5 Pet. 604, decided two years after by the Supreme Court of the United States, in full affirmance of those doctrines—by some unaccountable oversight, did not receive or was not deemed entitled to, the Chancellor's attention upon the question.

We have thus far seen, how and when this rule in regard to deduction of one third new for old in cases of *total technical loss*, had its origin in the state of New-York. We have seen how far it has been supported by subsequent *dicta*, in the absence of decisions, properly so called, in our courts down to the case of *The Am. Ins. Co.* v. *Ogden & Macomb.* We have shown that the question did not and could not arise in that case; and the manner in which it found its way there. We have sufficiently shown how it became adopted in Massachusetts; and that so far as we have now gone, it has found no countenance in the Supreme Court of the United States, but a direct and uniform negative. It is true the Supreme Court of Massachusetts has adhered to it, in form; though the question it appears, was met by their insurance companies after the long litigation in the case of the *Argonaut*, by a special clause in their policies.

In *Orrok* v. *The Commonwealth Ins. Co.*, 21 Pick. Rep. 456, *Putnam, J.* mentions the clause as follows:

" It is agreed that the insurer shall not have the right to abandon the vessel for the amount of damages merely, unless the amount which the insurer would be liable to pay under an adjustment as for a *partial loss*, shall exceed half the amount insured." 21 Pick. 467.

" This clause, says Putnam J., was introduced after the long litigation in the case of *Peele* v. *The Suffolk Ins. Co.* 7 Pick. 254, and was intended, without doubt, to provide by agreement for the construction which the underwriters contended to be right in the case relating to the *Argonaut*. They intended that the value in the policy should be the rule upon which the calculation should be made ; and they intended that one-third new for old, should be deducted ; and that if the loss exceeded one half of the value in the policy, or (as it is expressed) of the amount insured, then it should

be a constructive total loss." (See also *Hall* v. *Same*, 21 Pick. R. 472. *Reynolds* v. *Same*, 22 Pick. 191.

In South Carolina, the question has, so far as we have been able to ascertain, received no other judicial notice than is to be found in the case of *Cohen* v. *The Charleston Ins. Co.*, 1 Dudley's S. C. R., 147. In that case the Court of Appeals, O'Neall J. delivering the opinion of the Court, affirmed the doctrine of the Supreme Court of the U. S. He said, p. 151 : "I have no doubt that in the case of a claim for a total loss, if the repairs at the port where they are to be made, will exceed one half the value of the actual value of the vessel at that place after she is repaired, that the assured may abandon and claim for a total loss. *The Patapsco Ins. Co.* v. *Southgate*, & al., 5 Pet. Rep. 619." He adds, it is true :

" But I did not confine the jury to this view ; I told them that in a claim for a total loss, it was questioned by able jurists, whether in ascertaining the amount of repairs, one-third new for old ought to be deducted ? Phil. on Ins. 403, and that they in this case take the affirmative of the question as granted, and deduct one-third new for old, and assume the value of the vessel to be, as it was when she sailed $3,000. In this point of view the cost of repairs exceeded one half, for the total cost was estimated at $2,400 ; deduct one-third, $800, would leave the cost of repairs $1600 ; exceeding by $100 the half of the value of the vessel ;" and the motion for a new trial by the underwriters was dismissed.

Some reference is made in the Chancellor's opinion in the *Am. Ins. Co.* v. *Ogden*, to the French law of abandonment for damage sustained by the ship; and he refers to art. 369 of the Napoleon Code of Commerce, in a way that might lead one unacquainted with the French law of Insurance to infer that it did not permit abandonment unless the damage exceeded three-quarters of the value of the vessel. This would be an entire misapprehension of the provisions of the French code, and contrary to all the decisions of their courts upon the subject. By the 369th article of the Code du Commerce, § 3, it is provided ;

"Du Délaissement."

"Art. 369. Abandonment of property insured may be made,

1. In case of capture ;
2. Of shipwreck ;
3. Of stranding with bilging (*avec bris*) ;
4. Of innavigability by perils of the sea ;
5. In case of arrest by a foreign power ;
6. In case of loss or deterioration of the property insured, if the deterioration or loss amounts to at least three-fourths ;
7. It may be made, in case of arrest on the part of the government, after the voyage commenced."

Under the provisions of this article, the facts in the case of the American Insurance Co. would have constituted a clear case of *innavigability*, according to the definition of Pardessus. "When, in consequence of accidents the ship is reduced to a wholly disabled condition, (*une degradation entiere*) or that certain of her essential parts are in so irreparable a state that she can no longer exist and accomplish her destination (*plus subsister et remplir sa destination*) which is styled *innavigability*, the captain may exercise the right which we have indicated in art. 606, and ought to do all in his power to procure another ship."

"If the damages (*degradations*) are reparable, and it is necessary to raise a loan for that purpose, he ought to proceed as we have stated in art. 631," &c., 3 *Pardessus Cours de Droit Commercial*, p. 82, § 644. And so well is it understood in France, that the mere inability to raise funds by hypothecation of the ship, or the want of materials or workmen, is a good cause of abandonment for *innavigability*, that the assurers of Bourdeaux have inserted in their policies a clause expressly to provide against what is called the *relative* or *constructive* innavigability, produced by inability to procure funds, materials, or workmen for repairing. *Le Monnier, Commentaire sur les Principales Polices d'Assurance Maritime usitées en France* ; vol. ii., p. 2. "This article, says Le Monnier, is in express derogation of the dispositions of articles 369 and 375, of the Code of Commerce, And, under this clause of the Bourdeaux policy, excluding

abandonment except for *innavigability by perils of the sea*, or *absolute* innavigability, even loss or damage to the amount of three fourths, does not give the right to abandon." Le Monnier thus distinguishes the two kinds of innavigability. "*Absolute innavigability* is when the ship is physical-ly innavigable; altogether incapable of being repaired and resuming her voyage : *relative innavigability* is when the ship is temporarily incapable of navigating, but nevertheless susceptible of reparation ; but can not, whether on account of destitution of materials or workmen, whether for want of money or credit, receive the repairs which are indispensable to enable her to proceed to sea; both of these confer the right to abandon." Vol. ii., p. 42, § 268. It is admitted that the English rule, also, admits the right of abandonment for a *technical total loss,* under such circumstances, to be a *proper question for the jury,* according to the facts of each particular case, without deduction of one third new for old, in determining the right of abandonment. Let us now see how stands the French law and the usage and custom of other commercial nations as to this deduction.

A very late writer on the law of insurance in France, M. *Isidore Alauzet,* in his "*Traité General des Assurances Maritimes, Terrestres Mutuelles et sur la vie,*"* a work of high reputation and ability, has treated of it expressly, and has given us all requisite information upon the subject so far as France and her dependencies are concerned. In the second volume of this work, p. 153, he says :

"§ 322. In the action authorized for damages sustained by a ship, the code has not provided for a circumstance deserving a serious attention. All ships undergo every day, in the course of their navigation a gradual decay, (*deperisse-ment,*) which extends to all their parts; yet, if at the moment of setting sail, the ship ought to be in a condition to support the voyage which she is undertaking, it does not follow that her hull must be entirely new, or her tackle and apparel must be in a state the most perfect. When, in con-

---

* " A general Treatise upon Assurances ; Maritime, Terrestrial, Mutual and upon lives." By Isidore Alauzet, avocat, &c., Paris, 1843.

sequence of damage for which the assurers are liable, there is occasion to replace *objects* which have suffered either an average or a total loss, the integral payment to the assured of the value of the new objects put in the place of old or long used ones, will constitute an evident benefit to the owner; so that there are but few policies in use, which have not in their printed forms an express clause in this respect, purporting that all replacements, (*remplacements*,) furnitures, and workmanship, with which the assurers are charged, shall sustain a reduction of one-third upon the actual proved cost at the place of repairing, as a compensation for the difference between old and new."

This clause has been criticized by M. Dageville:

"In general," he says, "the assured gains nothing by having new for old; new wood, which is put upon old, does not render the latter any better; an old anchor, which has been well tried, is preferable to the uncertain merit of a new one.. The assured may gain something in respect to sails and cordage; but to this time no attention has been paid to these feeble advantages." Dageville, vol. 4, p. 7. "In effect, continues M. Alauzet, we do not find that any ancient author has spoken of such a clause, nor is it to be found in any of the precedents of policies, which have come down to us. We do not, nevertheless, concur with the opinion of M. Dageville; but we ought to rectify what his observations contain inaccurate in point of fact. In the clause under consideration, anchors are always excepted; no deduction is made from the price of new anchors; where the reduction takes place upon isolated objects, replaced in kind, such as a cable or a sail, the clause appears entirely reasonable; and in the case of repairs put upon the hull of the ship, such a reduction may sometimes prove a hardship; even then, however, the criticism will not be always applicable."

"However this may be, if the clause is inserted, it is valid; but *in the absence of all stipulation*, can the assurer claim a deduction from the assured upon the cost of repairs, with the view to compensate for this difference between the old and the new? The Court of Aix, has resolved this question affirmatively, (Aix, 28 June, 1831. *Journal du Palais*, vol. 23, p. 1754.) It is in opposition, upon this point, with the

Court of Cassation, which has decided that where the policy is silent, the assurer is liable to repay the integral amount of the expenses incurred, without any deduction from the price founded upon the general usage of commercial places, (Cassat. 13 July, 1829; *Journal du Palais*, v. 22, p. 1238.) We can not but approve this doctrine; however equitable such a clause may appear, it is impossible for us to find in the law itself, any provision, authorizing us to supply it."

Such scruples, with respect to "*supplying new clauses*" in effect, to policies of insurance, may seem overstrained to those who can admit that Chancellor Lansing had a right to supply the new and unheard of rule in *Smith* v. *Bell*, and still more to those who admire the "happy audacity," with which Chancellor Walworth has pushed the doctrine of the *value in the policy* being the sole criterion, by which the *right of abandonment is to be tested.* Whence did he derive this rule for our courts in New York, when in the case of *Center* v. *The Am. Ins. Co.*, at the New York Circuit, he first sought to introduce it? No such rule had then been sanctioned by judicial decision in the courts of New York. On the contrary, the only case then extant in our books, upon that subject was that of *Fontaine* v. *The Phœnix Ins. Co.*, 11 J. R. 293. In that case, which was tried before Chief Justice Kent, at the New York sittings, in November, 1813, he charged the jury upon the facts of the cause, as follows:

"That the remaining question would be, whether there had been a partial or a total loss. That the vessel was driven ashore by a tempest, and the surveyor certified that she ought to be sold; that such certificate was not conclusive, but if made *bona fide*, it was strong evidence. Presuming it to be an honest survey, it stated that the vessel could not be got off and repaired for half her value: that the value to be taken, in estimating whether she could be got off and repaired for one half, was not the value specified in the policy, but the value at Martinique, where the injury happened. It was immaterial whether she was in fact, got off for $100 or nothing. The case at the time of the survey appeared desperate, and the good fortune of the subsequent purchasers, could not destroy the right of the plaintiff." Not a word in regard to the deduction of one-third new for old, in fixing

the *half value,* is to be found in the charge of the Chief Justice.  The case of *Smith* v. *Bell* was exhumed, on the argument before the Supreme Court, by one of the counsel for the defendants; but only on the point of valuation according to the policy.  It seems, as to the other point, to have been tacitly repudiated.  The plaintiffs having obtained a verdict for a total loss, a motion for a new trial was made, and it was granted solely on the ground that the trade in which the vessel was engaged, was in violation of the act of Congress, interdicting commercial intercourse between the United States and Great Britain and France and their dependencies, (of March 1st, 1809.)  Yates, J., who delivered the opinion of the Supreme Court, thus concludes, after discussing the illegality of the trade:

"Although, on the other points, *I am inclined to think the case is with the plaintiffs,* yet the objection made by the defendant's counsel on the ground of forfeiture, being insurmountable, it can not change the result; a new trial must therefore be granted, with costs to abide the event."  11 J. R. 301.

And now if we had not renounced the controversy as to the value in the policy, we might pause here, and in the absence of all intermediate judicial decision, we should be entitled to demand by what right, by what authority, by what new patent of paramount jurisdiction, the learned Chancellor in the case of the *Am. Ins. Co.* v. *Ogden,* in the Court of Errors in 1829, uses the following extraordinary language. Speaking of the rule of the *valuation* in the policy being the *exclusive* one, he says : " *The courts of this country should be careful,* how they depart from the *established rule* or they will find the underwriters and the assured again involved in the ruinous litigation which the *adoption of a fixed and certain rule* was intended to obviate."

" Depart from the *established rule !*"  Have we not already shown that this "*fixed and certain rule,*" had found no resting place in England, none in the courts of this country, until thus attempted to be foisted upon us, first in the case of *Center* v. *The Am. Ins. Co.,* and next in this very case of the *The Am. Ins. Co.* v. *Ogden ?*  That no court in the

37

Union had adopted it but the Supreme Judicial Court of Massachusetts? That however well it may be settled there, it is settled the other way in the Supreme Court of the United States, and that it has never yet been legitimately adopted by any other state court? That all these *dicta* of the Chancellor are of no authority as judicial expositions of the law in that respect, and ought to be adjudged as the French courts say, "*non-recevables?*"

As to the other point, on which we are combating the doctrine and the authority of *Smith* v. *Bell*, we regard that case as a monstrous absurdity; founded upon a ludicrous misapprehension of Chancellor Lansing, in regard to the grounds of the decision in *Da Costa* v. *Newnham*. It is not only absurd, but it is positively unjust. The same reasoning that would establish such a deduction of one-third in the case of a *total technical loss*, might be invoked with equal force in favor of the deduction, where the ship foundered at sea and went down to the unfathomed caves of ocean, after losing all her spars, tackle and apparel.

But we have perhaps, already pursued this subject at greater length than the intrinsic importance of the question may seem to justify. It is not, however, on account of the magnitude of this single question, that we have thus dwelt upon it. It is because we have sought to trace and to expose this dangerous attempt at judicial legislation. It is because we feel the force and the obligation of the sentiment of Alauzet: "However equitable such a clause may appear, it is impossible for us to find in the law itself, any provisions authorizing us to supply it."

One word only, as to the remaining ground upon which the Chancellor in this case of *The Am. Ins. Co.* v. *Ogden*, places his vote for reversing the judgment of the Supreme Court, viz.; the laches of the owner of the vessel in not *providing funds at St. Thomas* for the repairs. Mr. Justice Bronson had previously taken a somewhat broader ground; and held that the mere inability to procure funds for that purpose, was not, *of itself*, a sufficient ground of abandonment, in a port of destination. He does, in his dissenting opinion, it is true, talk of the assured as "sending out his vessel without *furnishing the master* with a single dollar

to pay any necessary expenses; having no credit with his correspondent, the consignee, nor with any one else;" and he adds, "And he is still permitted to recover as for a total loss on the single ground of the inability of the master to procure the necessary funds to make repairs." 15 Wend. p. 541, 542. The Chancellor rather narrows this ground, and puts it upon the *laches* of the owner, in the particular case, not in having neglected to furnish the *master with funds* on his sailing, but with not having provided funds at the port of destination, or rather at this "*one of the ports*" of destination. As if, where a small vessel like this is trading to and from some half dozen ports of destination, it was a *neglect* sufficient to avoid a policy, that the owner does not provide a fund at *each* of those ports of destination, equal to *half the value* of the vessel, in case of damage by perils of the sea: for such a disaster is as likely to compel the vessel to take shelter in any one of those ports, as another; and thus he would be under equal obligation to provide such an amount of funds at all, as at any one of her intended ports of destination.

But if, upon the facts of this case, a question of *laches* in the owner does occur, in not providing those funds for repair; though we can see no warrant for the imputed neglect; still, this was a question for the cognizance of *the jury*, and not to be decided by the court. No decision is cited that makes such an omission a fatal objection to a recovery for a total technical loss, and still less, that it is to be taken for *matter of law*. What more legitimate question for a jury than this of *negligence*, which, it was contended, had led to the necessity of the sale of the vessel? The question of the *materiality* of certain information withheld from the underwriters, in the case of *Walden* v. *The Firemen's Ins. Co.*, 12 J. R. 513, was held by Chancellor Kent, and the Court of Errors, to be a question *exclusively* for the jury, under the charge of the court, as a *question of fact.* Ante p. 253–4.

To conclude, we may in reference to this part of the case, say in the words of Chancellor Kent, on that occasion: "It is for *this principle* that I feel solicitous; and not for any

thing in this particular cause. The case before us, is of tri-
fling consequence ; but the distinction I have suggested, goes
to the very root and essence of trial by jury."